[893 NE2d 120, 862 NYS2d 842]

Carmel Reddington, Appellant, v Staten Island University Hospital et al., Respondents.

Argued May 28, 2008; decided July 1, 2008

**POINTS OF COUNSEL**

*Behrins & Behrins, P.C.,* Staten Island (*Jonathan Behrins* of counsel), for appellant. I. Since a time-barred claim is not one initiated "in accordance" with section 740 of the Labor Law, it does not trigger the waiver provision set forth in section 740 (7). II. A cause of action under Labor Law § 741 is not subject to the waiver provision of Labor Law § 740 (7). (*Pipia v Nassau County,* 34 AD3d 664.) III. Even if the Labor Law § 740 (7) waiver extends to a Labor Law § 741 claim and is triggered by the initiation of a time-barred action under section 740, a plaintiff may properly avoid that consequence through an amended pleading that omits the section 740 claim. (*Collette v St. Luke's Roosevelt Hosp.,* 132 F Supp 2d 256; *Testa v Katt,* 330 US 386; *Ferres v City of New Rochelle,* 68 NY2d 446; *Shields v Citytrust Bancorp, Inc.,* 25 F3d 1124; *Gonzalez v John T. Mather Mem. Hosp.,* 147 Misc 2d 1082; *Sage Realty Corp. v Proskauer Rose,* 251 AD2d 35; *Rotwein v Sunharbor Manor Residential Health Care Facility,* 181 Misc 2d 847; *Pipas v Syracuse Home Assn.,* 226 AD2d 1097.) IV. The definition of "employee" in Labor Law § 741 encompasses an individual who, though not rendering medical treatment, renders the kind of services that Carmel Reddington provided under her job titles for defendant Staten Island University Hospital.

*Epstein Becker & Green, P.C.,* New York City (*Kenneth J. Kelly*

and *Jennifer M. Horowitz* of counsel), for respondents. I. The institution of a time-barred claim pursuant to Labor Law § 740 triggers section 740 (7)'s waiver provision and bars a Labor Law § 741 claim. (*People v Finnegan*, 85 NY2d 53; *People ex rel. Harris v Sullivan*, 74 NY2d 305; *Desiderio v Ochs*, 100 NY2d 159; *Matter of Killian [General Motors Corp., Delco Chassis Div.—Sweeney]*, 89 NY2d 748; *Murphy v American Home Prods. Corp.*, 58 NY2d 293; *Collette v St. Luke's Roosevelt Hosp.*, 132 F Supp 2d 256; *Feinman v Morgan Stanley Dean Witter*, 193 Misc 2d 496; *Rotwein v Sunharbor Manor Residential Health Care Facility*, 181 Misc 2d 847; *Pipas v Syracuse Home Assn.*, 226 AD2d 1097; *McGrane v Reader's Digest Assn., Inc.*, 863 F Supp 183, 60 F3d 811.) II. Labor Law § 741 does not afford protection to employees such as appellant who do not "perform" health care services.

**OPINION OF THE COURT**

READ, J.

The United States Circuit Court of Appeals for the Second Circuit has certified two questions to us: the first involves the relationship between the waiver clause in Labor Law § 740 (New York's Whistleblower Law) and Labor Law § 741 (New York's Health Care Whistleblower Law); the second relates to the scope of section 741's coverage. We begin by summarizing the facts alleged in the amended complaint.

I.

The Allegations in the Amended Complaint

Plaintiff Carmel Reddington was employed at defendant Staten Island University Hospital from December 19, 1994 to October 30, 2002. Reddington was first hired as a coordinator of volunteer services; in March 1998, she was promoted to the position of manager of volunteer services.

In early 2002, the Hospital launched a new program to attract cancer patients from Italy for stereotactic radiosurgery treatment at its facilities in New York. In May 2002, Hospital management tapped Reddington, who spoke Italian and was familiar with Italian culture and customs, to serve as a translator for patients being treated in this new program—eventually dubbed the International Patient Program—and their families. Reddington agreed to take on this extra responsibility until the Hospital hired someone for the job.

Upon meeting the Italian families for the first time, Reddington was "besieged with complaints of inadequate and non-treatment, abandonment, and failure to provide a translator." Although she reported this to Hospital management, nothing was done and complaints persisted.

In June 2002, Reddington served as a translator at a meeting between Hospital management and "two supposed 'doctors' from Italy." The attendees discussed opening a second office in Italy to be managed by one of the Italian doctors, who would receive a referral fee for each patient he sent to the Hospital for treatment. The other doctor was already receiving referral fees in connection with an existing office in Naples, Italy. When Reddington conveyed her uneasiness about the propriety and legality of this arrangement to Hospital management, she was treated dismissively by her supervisor.

Over the next two months, Reddington "worked feverishly with Italian patients and their families," who continued to report problems to her, which she, in turn, conveyed to her supervisor. In August 2002, Reddington was asked to be the Program's director, and she took the job. She claims that Hospital management repeatedly assured her that her former position "would always be available to her" if her new job did not work out. When Reddington "expressed reservations . . . about leaving for vacation without properly training" her replacement as manager of volunteer services, she was told " 'not to worry', since [the Hospital] already had someone in mind."

Reddington returned from her vacation and, on August 30, 2002, received and signed a written job description for her new position as "Director-International Patient Program." Her duties and responsibilities, as set forth in the job description, were to

> "1. Coordinate arrival, transportation and lodging for international patients and ensure continuity with clinical services staff.

> "2. Coordinate and develop with Chief Medical Officer and appropriate medical personnel, services to be offered to international patients.

> "3. Coordinate marketing of the international patients program with Senior Staff.

> "4. Manage and train personnel providing transla-

tion services and maintain an on-call schedule to ensure coverage.

"5. Maintain International Patients Welcome Center to promote positive image of Staten Island University Hospital and its services.

"6. Develop calendar of activities for international patients to further enhance their experience at Staten Island University Hospital.

"7. Maintain up to date data base on patients serviced.

"8. Distribute, collect and analyze patient satisfaction questionnaires to continually enhance services.

"9. Communicate with consulate to coordinate patient[s'] letters of service."

In time, Reddington came to believe that her leadership as the Program's director was being undermined by another Hospital employee, who reported to the senior vice-president of human resources. She objected about this to her supervisor.

On October 25, 2002, Reddington received a telephone call from the vice-president of human resources, who requested a meeting with her. At this meeting, Reddington repeated her grievances about the other employee's role in the Program. She complained, for example, that this other employee had given her "orders that there would be no more trips to the Retreat House; changed the schedule for bringing the patients to a prayer group and Mass; and cancelled the weekday trips to Manhattan." The vice-president "conceded . . . that [Reddington] had some 'legitimate concerns' " and committed to "investigate the matter."

The vice-president also advised her, however, that the other employee "was to be 'the point person' " between Reddington and her supervisor. When asked if she "was 'okay' with that," Reddington responded "that she had no problem with [the] arrangement, and was merely asking for some clarification on the logistics of her department." The vice-president then asked Reddington to meet with her again on October 30th "so they could try to clear up any misunderstandings."

At the meeting on October 30th, the vice-president "accused" Reddington of calling her supervisor after having been directed not to do so. Reddington replied that she "was unaware that she was prohibited from speaking with" her supervisor at all,

and, in any event, had done so to coordinate the transportation of a dead patient's body back home to England. When the vice-president commented that Reddington's job responsibilities related only to Italian patients, Reddington "explained" that "this was untrue," and that she had, in fact, spent several hours the previous day with the British patient's family, "mak[ing] the necessary arrangements, and comforting them."

At the conclusion of this meeting, the vice-president fired Reddington. When Reddington asked to return to her former position as manager of volunteer services, the vice-president refused. When Reddington "pleaded" for an explanation of "what she had done wrong," she was informed that she had " 'disobeyed orders,' " and was told to " 'pack up and leave.' "

In November 2002, Reddington contacted the New York State Department of Labor, which advised her to obtain the Hospital's reasons for firing her in writing. After several requests by Reddington, the Hospital sent her a letter dated December 10, 2002, which stated that she had been dismissed " 'due to probationary failure.' " According to Reddington, she was never informed that her new position involved a probationary period.

## Prior Proceedings

After receiving a right-to-sue notice from the Equal Employment Opportunity Commission, Reddington filed a complaint in the United States District Court for the Eastern District of New York on March 16, 2004, naming the Hospital and North Shore-Long Island Jewish Health System, Inc., which allegedly owned and/or controlled the Hospital, as defendants. In her complaint, Reddington asserted numerous causes of action: violations of federal, state and municipal laws prohibiting age discrimination in employment; violation of New York's Whistleblower Law (Labor Law § 740); violation of the New York's Health Care Whistleblower Law (Labor Law § 741); violation of the Fair Labor Standards Act; intentional infliction of emotional distress; and breach of contract.

After defendants moved to dismiss for failure to state a claim and for lack of subject-matter jurisdiction as well as for an award of attorneys' fees under Labor Law § 740 (6), Reddington amended her complaint on August 24, 2004. She withdrew her claim under Labor Law § 740—which was time-barred—and the Fair Labor Standards Act, as well as her claim for intentional infliction of emotional distress. Defendants again moved to dismiss and for an award of attorneys' fees.

On June 21, 2005, the District Court ruled on the defendants' motion, granting it in part by dismissing Reddington's claims under Labor Law § 741 and for breach of contract, and denying it in part by concluding that Reddington had stated claims under federal, state and municipal age discrimination laws (*see Reddington v Staten Is. Univ. Hosp.*, 373 F Supp 2d 177 [ED NY 2005]). The Judge declined to award attorneys' fees to the Hospital.

With respect to Reddington's Labor Law § 741 claim, the District Court found that "plaintiff waived this claim when she asserted a claim for retaliatory termination under § 740 in her original complaint," citing the "waiver" or "election of remedies" provision in Labor Law § 740 (7) (*Reddington*, 373 F Supp 2d at 187). The District Court Judge rejected Reddington's argument that amending her complaint to omit the section 740 claim precluded any section 740 (7) waiver; he concluded that the plain text of section 740 (7) refers to *"institut[ing] an action"* (*id.* at 186). In addition, in a footnote the Judge offered as an alternative basis for dismissal that section 741 did not apply to Reddington because

> "[t]here [were] no allegations in the complaint that [she] performed health care services while employed by [the Hospital] or was a health care employee. Instead, the complaint alleges that she acted as an interpreter and that she held the positions of Coordinator and Manager of Volunteer Services and later Director of the [Program]" (*id.* at 187 n 7 [internal quotation marks omitted]).

After discovery on the age discrimination claims, the parties stipulated to their dismissal with prejudice, which led to entry of final judgment. Reddington then appealed the dismissal of her Labor Law § 741 claim to the Second Circuit, which observed that the District Court

> "based its conclusion [that Reddington failed to state a claim under section 741] on two alternative grounds: first, that Reddington waived her claim under section 741, the health care whistleblower provision, by previously initiating an action under section 740, New York's general whistleblower provision; and second, that Reddington was not an employee within the meaning of section 741" (*Reddington v Staten Is. Univ. Hosp.*, 511 F3d 126, 132 [2d Cir 2007] [citation omitted]).

Finding no controlling decision of this Court on either issue, and substantial disagreement among state and federal courts on both, the Second Circuit certified the following two questions to us:

> "(1) Does the institution of a time-barred claim pursuant to New York Labor Law § 740 simultaneously with a claim pursuant to New York Labor Law § 741 trigger section 740(7)'s waiver provision and thereby bar the section 741 claim, even if the section 740 claim is subsequently withdrawn?

> "(2) Does the definition of employee in New York Labor Law § 741 encompass an individual who does not render medical treatment, and under what circumstances?" (*Id.* at 136.)

For the reasons that follow, we answer both questions in the negative.

## II.

Section 740 (7), which contains the Whistleblower Law's so-called "waiver" provision, states as follows:

> "Existing rights. Nothing in this section shall be deemed to diminish the rights, privileges, or remedies of any employee under any other law or regulation or under any collective bargaining agreement or employment contract; *except that the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law*" (emphasis added).

The plain text of this provision indicates that "institut[ing]" an action—without anything more—triggers waiver. And in New York, an action is instituted with the filing of a complaint and service upon opposing parties. Moreover, documents in the Bill Jacket repeatedly refer to section 740 (7) as an election-of-remedies provision, thus contemplating that a plaintiff will *choose* whether to file a section 740 whistleblower claim or some other claim (*see e.g.* Mem of Pub Empl Relations Bd, Bill Jacket, L 1984, ch 660, at 16).

Although Reddington argues that either filing a time-barred section 740 claim (as she did), or amending a complaint to omit a section 740 claim (as she also did), precludes waiver,

section 740 (7)'s language and legislative history do not support her position. A "cause of action will be deemed the same if the amended and original complaints both seek to enforce the same obligation or liability" (*Abrams v Maryland Cas. Co.*, 300 NY 80, 86 [1949] [citations omitted]). In short, Reddington clearly "institut[ed] . . . an action in accordance with [section 740]." We conclude, however, that Reddington nonetheless did not waive the right to pursue her section 741 claim. This conclusion flows from the uniquely interconnected elements of sections 740 and 741; specifically, every section 741 claim expressly relies on and incorporates section 740 for purposes of enforcement.

Labor Law § 741 (4) states: "Enforcement. A health care employee may seek enforcement of this section *pursuant to paragraph (d) of subdivision four of section seven hundred forty of this article*" (emphasis added). Importantly, Labor Law § 740—unlike section 741—explicitly creates a private right of action, stating in relevant part:

"Violation; remedy. (a) An employee who has been the subject of a retaliatory personnel action in violation of this section may institute a civil action in a court of competent jurisdiction for relief as set forth in subdivision five of this section within one year after the alleged retaliatory personnel action was taken" (Labor Law § 740 [4] [a]).

Paragraph (d) of section 740 (4)—specified in section 741 (4) as the means to enforce section 741—provides that

"*a health care employee who has been the subject of a retaliatory action by a health care employer in violation of section seven hundred forty-one of this article may institute a civil action in a court of competent jurisdiction for relief as set forth in subdivision five of this section within two years after the alleged retaliatory personnel action was taken.* In addition to the relief set forth in that subdivision, the court, in its discretion, based upon a finding that the employer acted in bad faith in the retaliatory action, may assess the employer a civil penalty of an amount not to exceed ten thousand dollars, to be paid to the improving quality of patient care fund, established pursuant to section ninety-seven-aaaa of the state finance law" (emphasis added).

This provision was enacted concurrently with section 741 (*see* L 2002, ch 24, §§ 1, 2); it was not enacted with the rest of section 740 (*see* L 1984, ch 660, § 2).

Thus, rather than creating its own private right of action, Labor Law § 741 contemplates enforcement through a Labor Law § 740 (4) civil suit. This is critically important, as it completely changes the nature of the waiver inquiry in a case involving sections 740 and 741. That is, the plain language of section 741 (4) indicates that a claim under that provision necessarily involves section 740 (4) (d) and therefore section 740, to that extent, remains in the case, eliminating any notion of waiver. This is so whether or not a separate section 740 claim is pleaded in the original complaint.

Put another way, section 740 (7), as noted previously, is an election-of-remedies provision (*see e.g. Reddington*, 511 F3d at 132; *Collette v St. Luke's Roosevelt Hosp.*, 132 F Supp 2d 256, 268-269 [SD NY 2001]). Yet no election of remedies is implicated when sections 741 and 740 are pleaded together, or section 741 is pleaded after a plaintiff has instituted a section 740 claim, because section 741 provides no independent remedy. Section 741 sets out substantive legal requirements while explicitly relying on section 740 for their enforcement (*see* Labor Law § 741 [4]). Importantly, as the entire point of section 740 (7)'s waiver provision is to prevent duplicative recovery, a plaintiff health care employee can only recover damages for a section 741/740 (4) violation (specific) *or* a section 740 violation (general), but *not* for both.

The dissent objects that section 740 (7) does not itself include "the words . . . 'election of remedies' " or state that "there should be no duplicative recovery" (dissenting op at 94). By the same token, however, the Legislature did not, as previously noted, choose to create a right of action to enforce section 741 independent of section 740, which it surely would have done if it had intended for a plaintiff who initiates a section 740 action to thereby waive any subsequent claim under section 741 relating to the same alleged retaliatory action.

## III.

The specialized protection offered by Labor Law § 741 extends only to those health care employees who "perform[ ] health care services" (Labor Law § 741 [1] [a]). Specifically, section 741 (2) states:

"Retaliatory action prohibited. Notwithstanding any

other provision of law, no employer shall take retaliatory action against any employee because the employee does any of the following:

"(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

"(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."

The terms "employee" and "improper quality of patient care" are defined in section 741 (1) (a) and (d) respectively. For purposes of section 741, "employee" is defined as "any person *who performs health care services* for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration" (Labor Law § 741 [1] [a] [emphasis added]) and "improper quality of patient care" is defined to

"mean[ ], with respect to patient care, any practice, procedure, action or failure to act of an employer which violates any law, rule, regulation or declaratory ruling adopted pursuant to law, where such violation relates to matters which may present a substantial and specific danger to public health or safety *or a significant threat to the health of a specific patient*" (Labor Law § 741 [1] [d] [emphasis added]).

Unlike Labor Law § 740, which defines "employee" to "mean[ ] an individual who performs services for and under the control and direction of an employer for wages or other remuneration" (Labor Law § 740 [1] [a]), Labor Law § 741 therefore has an exactingly specific definition of "employee": "any person who *performs health care services* for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration" (Labor Law § 741 [1] [a] [emphasis added]). This definition of employee contains two limitations: first, it applies only to those employed by "employer[s] . . . provid[ing] health care services," and second, the category of covered workers is further narrowed to those "perform[ing] health care services." It is important that

section 741 (1) (a) limits *both* type of employer ("employer which provides health care services") and—given a qualifying employer—the type of employee ("any person who performs health care services"). This puts a clear outer boundary on employees covered by section 741: in order to give effect to both limitations within section 741 (1) (a), the universe of covered employees must be smaller than all those employed by a health care provider, who are afforded the more generalized protection of section 740 (*see* Labor Law § 740 [2] [a]; *see also* Budget Report on NY Assembly Bill A9454, at 1, Bill Jacket, L 2002, ch 24 ["The instant bill would build upon (section 740's) protections and would specifically address the employment situations of health care workers"]).

Because some limiting principle is mandated by section 741, the question becomes the meaning of the phrase "performs health care services." Webster's Collegiate Dictionary defines "perform" as "carry out; do" or "to do in a formal manner or according to prescribed ritual" (Merriam-Webster's Collegiate Dictionary 863 [10th ed 1998]), while the Oxford English Dictionary defines perform as "to carry through to completion; to complete, finish, perfect (an action process, work, etc.)" (10 Oxford English Dictionary 543 [2d ed 1989]). Similarly, Roget's Thesaurus defines "perform" as "[t]o begin and carry through to completion" and supplies the synonyms "do," "execute," and "prosecute" (Roget's II: The New Thesaurus 721 [3d ed 1995]). Nowhere is the term "perform" defined to mean "coordinate," "communicate," or "develop."

■ We have observed that "[i]n construing statutes, it is a well-established rule that resort must be had to the natural signification of the words employed, and if they have a definite meaning, which involves no absurdity or contradiction, there is no room for construction and courts have no right to add to or take away from that meaning" (*Majewski v Broadalbin-Perth Cent. School Dist.*, 91 NY2d 577, 583 [1998], quoting *Tompkins v Hunter*, 149 NY 117, 122-123 [1896] [additional citation omitted]). Here, the "natural signification" of section 741 (1) (a) is quite definite: to be subject to the special protections of section 741, an employee of a health care provider must "perform[ ] health care services," which means to actually supply health care services, not merely to coordinate with those who do.

A review of the rest of Labor Law § 741, as well as the statute's legislative history, further bolsters the plain-text interpretation of section 741 (1) (a). The Assembly memorandum in

support of Laws of 2002 (ch 24)—which enacted Labor Law § 741 as well as Labor Law § 740 (4) (d)—states, under the subtitle "JUSTIFICATION":

"This legislation does not specifically mention adherence to acceptable standards of professional practice or a code of ethics. The bill does allow a *professional* to go to court to be made whole after retaliatory action when the *professional* reasonably believes that a state law, rule or regulation has been violated. It is expected that a *professional* would reasonably believe that a *practice identified in their professional standard or ethic* as best practice or prohibited practice would be reflected in the determinations of the state agencies that regulate *professional practice*. A *professional* who knows that a colleague or a facility has been sanctioned or disciplined by the state for improper patient care could reasonably believe that the state's penalties were based upon a violation of state law, rule or regulation. Department of Health regulations (Section 405.5) require facilities to provide nurse staffing 'to ensure, when needed in accordance with generally accepted standards of nursing practice, the immediate availability of a registered professional nurse for bedside care of any patient.' *Nurses* would reasonably believe when, *in their professional judgment*, they were not immediately available to meet a patient's needs that there was a violation of state regulations. Therefore, they would be able to have their day in court following retaliation for speaking out about their perception of inadequate staffing levels" (Assembly Rules Comm Mem in Support, at 1, Bill Jacket, L 2002, ch 24 [emphases added]).

This legislative history indicates that the specialized protections of Labor Law § 741 were meant to protect professional judgments regarding the quality of patient care. The example given in the Assembly memorandum—the only concrete example provided by the bill's sponsors—is illustrative: a nursing regulation requiring "immediate availability" of bedside nursing care is cited. This is not to say that section 741 only covers employees who possess professional licenses; there may be cases where an employee without a professional license performs health care services in the employment of a health care provider. Nonethe-

less, section 741, which offers exceptional and specialized whistleblower protection over and above the generalized protection afforded by section 740, is meant to safeguard only those employees who are qualified by virtue of training and/or experience to make knowledgeable judgments as to the quality of patient care, and whose jobs require them to make these judgments.

Accordingly, the certified questions should be answered in the negative.

SMITH, J. (dissenting in part). I dissent from the majority's negative answer to the first question, and would hold that the institution of a claim under Labor Law § 740 bars a claim under Labor Law § 741.

Labor Law § 740 (7) says that "the institution of an action in accordance with this section shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, law, rule or regulation or under the common law." This is an unusual statute. While it raises a number of interpretative questions, its basic thrust is clear enough: a plaintiff who sues under Labor Law § 740 waives his or her other rights. The message this sends to potential plaintiffs is: Do not sue under Labor Law § 740 unless you are confident that your claim is excellent.

There is much to be said for encouraging such a cautious approach to bringing lawsuits. That approach, however, is utterly alien to the shoot-first-and-ask-questions-later atmosphere so familiar to most American litigators. Perhaps for this reason, the waiver clause of section 740 (7) has had a checkered career.

Some courts have refused to hold, despite the plain language of the statute, that the mere "institution" of an action under section 740 triggers the waiver provision. They have held, in effect, that an action can be "un-instituted" if the section 740 claim is promptly dismissed or abandoned (*Gonzalez v John T. Mather Mem. Hosp.*, 147 Misc 2d 1082, 1083-1084 [Sup Ct, Suffolk County 1990]; *Clarke v TRW, Inc.*, 1994 WL 591677, *3-4, 1994 US Dist LEXIS 15423, *10-13 [ND NY 1994]; *cf. Gaughan v Nelson*, 1997 WL 80549, *2, 1997 US Dist LEXIS 1942, *5-7 [SD NY 1997]). *Clarke* also suggests that a section 740 claim dismissed for a legal deficiency "prior to judgment" may not trigger the waiver because it was not instituted "in accordance with" section 740 (1994 WL 591677 at *3, 1994 US Dist LEXIS 15423 at *10)—thus suggesting to prospective plaintiffs that it

is safe to begin a bad lawsuit, but not a good one. I agree with today's majority in disapproving of these two theories.

An extensive analysis by a federal district court, proceeding from the indisputable premise that a plaintiff filing under section 740 does not waive *all* other rights—she does not, for example, give up the right to sue her husband for divorce or her doctor for malpractice—concludes that only other whistleblower claims are waived (*Collette v St. Luke's Roosevelt Hosp.*, 132 F Supp 2d 256 [SD NY 2001]). The *Collette* court reached this conclusion at a time when New York had no other whistleblower statute. Other courts have given section 740 (7) a less restrictive reading (*see e.g. Pipas v Syracuse Home Assn.*, 226 AD2d 1097 [4th Dept 1996] [holding the waiver applicable to all claims that "relate to the retaliatory discharge"]; *Kraus v Brandstetter*, 185 AD2d 302, 302-303 [2d Dept 1992] [same]; *Rotwein v Sunharbor Manor Residential Health Care Facility*, 181 Misc 2d 847, 853-856 [Sup Ct, Nassau County 1999] [same]; *see also Owitz v Beth Israel Med. Ctr.*, 1 Misc 3d 912[A], 2004 NY Slip Op 50046[U], *4 [Sup Ct, NY County 2004] [referring to "the *Collette* Court's very narrow interpretation of the § 740 waiver"]).

Though New York had no other whistleblower statute when *Collette* was decided, it has one now—and the majority today holds that a claim under the new statute, section 741, is immune from the waiver. The basis for the majority's holding is "the uniquely interconnected elements of sections 740 and 741" (majority op at 88). The majority says that "no election of remedies is implicated" when both sections are pleaded, "because section 741 provides no independent remedy" (*id.* at 89). But the words of the statute are not "election of remedies," but "waiver of the rights and remedies available under any other . . . law" (Labor Law § 740 [7]). I see nothing in these words to suggest that they do not apply to claims under section 741. The majority seems to hold that section 741 is not an "other" law, but that holding is logically unsound. Laws can be, as these two statutes are, closely related to each other and still distinct.

The majority says that "the entire point of section 740 (7)'s waiver provision is to prevent duplicative recovery" (majority op at 89). It offers no reasoning and no authority in support of this assertion, which seems to me simply wrong. If the authors of this statute wanted only to prevent duplicative recovery, they could have provided there should be no duplicative recovery. What they apparently did want was to require plaintiffs who

brought section 740 cases to give up their other claims—a goal that is frustrated by the majority's holding today.

This case, in short, must be added to the curious collection of decisions that have declined to give effect to the clearly expressed purpose of the waiver clause in Labor Law § 740 (7). If the New York Legislature really wants to require plaintiffs who begin section 740 actions to waive all their related claims, it will have to speak even more clearly.

Chief Judge KAYE and Judges GRAFFEO, PIGOTT and JONES concur with Judge READ; Judge SMITH dissents in part and votes to answer certified question No. 1 in the affirmative in a separate opinion; Judge CIPARICK taking no part.

Following certification of questions by the United States Court of Appeals for the Second Circuit and acceptance of the questions by this Court pursuant to section 500.27 of the Rules of Practice of the Court of Appeals (22 NYCRR 500.27), and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified questions answered in the negative.