■ In the Matter of NANCY MOYNIHAN, Respondent, v NEW YORK CITY HEALTH AND HOSPITALS CORPORATION, Appellant, et al., Respondent. [993 NYS2d 260]—

Order, Supreme Court, New York County (Cynthia S. Kern, J.), entered October 5, 2010, which granted a petition for leave to file a late notice of claim against respondent-appellant New York City Health and Hospitals Corporation (HHC) pursuant to General Municipal Law § 50-e, reversed, on the law, without costs, the petition denied, the proceeding brought pursuant to CPLR article 4 dismissed, and the proposed complaint dismissed, with prejudice. The Clerk is directed to enter judgment accordingly.

The crux of petitioner's claim against her former employer, respondent HHC, is that, on April 6, 2009, HHC fired her from her position with HHC's Office of Clinical and Health Services Research (OCHSR), not because of budget constraints (as petitioner was told), but in retaliation for her objection to the failure of the documentation of many human-subject research programs submitted to her office (which it was her job to review) to comply with applicable regulatory requirements. The verified complaint for petitioner's proposed action against HHC summarizes the conduct for which HHC allegedly retaliated against petitioner as follows:

"24. From the beginning of her employment by HHC,

[petitioner] had reason to believe that a number of HHC hospitals . . . were out of compliance with HHC operating procedures, for reasons including but not limited to: (1) failure to comply with HIPPA, IRB and protocol requirements; (2) failure to provide informed consents in compliance with regulatory requirements; and (3) failure to submit information relating to adverse events occurring in the course of human subject research.

"25. [Petitioner] brought such noncompliance to the attention of affiliates, officials at HHC hospitals and HHC administration, and attempted to enforce applicable federal, state and city laws and regulations."

Based on her own allegations in the proposed verified complaint and other sworn statements submitted with her application for leave to file a late notice of claim, petitioner reviewed the documentation of human-subject research projects conducted at HHC facilities for regulatory compliance. She neither provided treatment nor care to patients, nor did she supervise or direct those who did; nor did she have responsibility for the provision of resources needed for treatment or care. She does not allege that she had interaction with patients or any decision-making authority concerning the care administered to any particular patient.

Petitioner seeks to assert causes of action against HHC for retaliatory termination based on Labor Law § 740, which applies to all employees of health care organizations, and Labor Law § 741, which applies more narrowly to employees of health care organizations who actually "perform[ ] health care services" (§ 741 [1] [a]), as well as a few other claims to be discussed later. She failed to serve a notice of claim on HHC within 90 days of her termination on April 6, 2009, as required by General Municipal Law § 50-e and the New York City Health and Hospitals Corporation Act (HHC Act) § 20 (2) (McKinney's Uncons Laws of NY § 7401 [2]), although she did serve a notice of claim within the 90-day period upon the Office of the Comptroller of New York City, which does not have the authority to receive notices of claim on behalf of HHC. On July 2, 2010, petitioner made the instant application for leave to serve a late notice of claim and file the annexed verified complaint. Supreme Court granted the application.

Upon HHC's appeal, we reverse the granting of the motion for leave to file a late notice of claim against HHC, and accordingly dismiss the proposed complaint, on the ground that, as a matter of law, petitioner cannot prevail on any of the claims that she seeks to assert. Because petitioner does not assert any

legally viable causes of action, we need not consider whether Supreme Court's granting of leave to file a late notice of claim would otherwise have been a proper exercise of discretion.

We turn first to the claim under Labor Law § 740. That cause of action is time-barred under the terms of the statute itself because, as previously stated, HHC terminated petitioner's employment on April 6, 2009, and petitioner filed her petition for leave to file a late notice of claim on July 2, 2010, after the expiration of the one-year statute of limitations incorporated into the statute (*see* Labor Law § 740 [4] [a]). General Municipal Law § 50-e (5), made applicable to HHC by HHC Act § 20 (2), permits a court to entertain a motion for leave to serve a late notice of claim only within the applicable limitations period, not, as here, after the limitations period has expired. Contrary to Supreme Court's view, the one-year statute of limitations that is part of section 740 takes precedence over the one-year and 90-day limitations period set forth in the HHC Act (*see Romano v Romano*, 19 NY2d 444, 447 [1967]).

Although not time-barred, the claim under Labor Law § 741 is also without merit as a matter of law. Section 741 affords to a health care "employee," as defined in the statute, a cause of action against the employer for "retaliatory action" (§ 741 [2]) taken

"because the employee does any of the following:

"(a) discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care; or

"(b) objects to, or refuses to participate in any activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care."

Section 741 defines the term "employee," as used in that statute, as "any person *who performs health care services* for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration" (§ 741 [1] [a] [emphasis added]). The Court of Appeals, describing this definition as "exactingly specific" (*Reddington v Staten Is. Univ. Hosp.*, 11 NY3d 80, 90 [2008]), has held that "the 'natural signification' of section 741 (1) (a) is quite definite: to be subject to the special protections of section 741, an employee of a health care provider must 'perform[ ] health care services,' which means to actually supply health care services, not merely to coordinate with those who do" (*id.* at 91). Section 741, the Court of Appeals concluded, "is meant

to safeguard only those employees who are qualified by virtue of training and/or experience to make knowledgeable judgments as to the quality of patient care, *and whose jobs require them to make these judgments*" (*id.* at 93 [emphasis added]). Accordingly, the *Reddington* Court held that section 741 does not apply to "an individual who does not render medical treatment" (*id.* at 87 [internal quotation marks omitted] [answering the second certified question in the negative]).

Based on the Court of Appeals' holding in *Reddington*, the Second Circuit (which had certified the question to the Court of Appeals in that case) affirmed the dismissal of a claim under section 741 asserted by a hospital employee who "allege[d] that she coordinated and developed certain services for the Hospital's patients, took charge of patient satisfaction questionnaires, and managed and trained personnel who provided translation assistance, but . . . [did] not allege that she supplied any treatment" (*Reddington v Staten Is. Univ. Hosp.*, 543 F3d 91, 93 [2d Cir 2008]). Similarly, this Court dismissed a claim under section 741 asserted by "a licensed clinical social worker . . . [who] alleges that she 'secure[d] prescribed medications,' 'evaluate[d] the need for and arrange[d] for individual patients' appropriate staffing and treatment,' and was 'personally involved in ensuring that patients received protective and healthful grooming and other health-related treatment.' These allegations establish that plaintiff 'merely . . . coordinate[d] with those who [performed health care services]' " (*Webb-Weber v Community Action for Human Servs., Inc.*, 98 AD3d 923, 924 [1st Dept 2012], *revd on other grounds* 23 NY3d 448 [2014], quoting *Reddington*, 11 NY3d at 91).[1]

In this case, petitioner, by her own account, reviewed the supporting paperwork for research projects involving human subjects for compliance with applicable regulatory requirements. She had no responsibility, direct or indirect, for providing treatment or care to any patient, for any patient outcome, or even for facilitating the provision of care or treatment to patients through the allocation of HHC resources. She was charged

---

1. In its *Webb-Weber* decision, which reinstated a claim under Labor Law § 740, the Court of Appeals did not address the issue of whether the plaintiff was an "employee" within the scope of Labor Law § 741 because, as stated in Judge Pigott's opinion, the plaintiff "ha[d] abandoned th[e] claim [under section 741] on this appeal and ask[ed] for reinstatement of only the section 740 claim" (23 NY3d at 451 n 2). Unlike section 741, section 740 does not restrict its coverage to employees who perform health care services (*see* Labor Law § 740 [1] [a] [defining the term "employee" as used in section 740 to mean "an individual who performs services for and under the control and direction of an employer for wages or other remuneration"]).

simply with making sure that HHC did not run afoul of applicable legal requirements in the documentation of human-subject research projects conducted at its hospitals. She was even further removed from the actual provision of care or treatment to patients than were the plaintiffs in *Reddington* and *Webb-Weber*. As HHC aptly points out in its reply brief, petitioner "did not see, treat or otherwise interact with patients, nor did she have any decision making authority regarding direct patient health care."

The dissent stresses petitioner's "experience" as a registered nurse licensed to practice in New York—which, while undisputed, is irrelevant to her standing under section 741, given the absence of any basis in the record for the dissent's characterization of petitioner's position as one that actually required her "to make . . . judgments [concerning] the quality of patient care" (*Reddington*, 11 NY3d at 93). Again, in her job at OCHSR, petitioner participated in the process of approving research projects at inception, and in monitoring ongoing projects, based on whether the researchers had complied with applicable legal requirements and HHC procedures. Nowhere does petitioner allege that she rendered any independent "judgment" about the quality of any patient's health care. While we appreciate the importance to the integrity of the scientific enterprise of the work petitioner did at OCHSR, we do not believe that she was "perform[ing] health care services" (§ 741 [1] [a]) in this position.

The dissent attempts to distinguish *Reddington* and *Webb-Weber* on the ground that the plaintiffs in those cases (a coordinator of volunteer services and translator in *Reddington*, a clinical social worker in *Webb-Weber*), unlike petitioner herein, were not trained medical professionals. We disagree. Although petitioner was a licensed registered nurse qualified to "perform[ ] health care services" (§ 741 [1] [a]), during her employment at OCHSR, she neither performed health care services nor was she required to make "judgments as to the quality of patient care" (*Reddington*, 11 NY3d at 93) based on her training and experience as a nurse. Indeed, the plaintiffs in *Reddington* and *Webb-Weber*, notwithstanding their lack of health care credentials, performed tasks closer to providing health care services than petitioner did at OCHSR, since they actively coordinated with providers of health care services and, in one case, even secured prescribed medications. Petitioner, by contrast, merely reviewed the documentation generated by medical researchers for compliance with regulatory requirements. If the tasks performed by the *Reddington* and *Webb-Weber* plaintiffs did not give them

standing under section 741, still less should petitioner's review functions qualify her for such standing.

The dissent also stresses petitioner's allegation that the actions she took that allegedly led to her termination were motivated by her concern for the quality of the care that the subjects of the research programs she monitored would ultimately receive. This motivation, laudable though it was, does not confer standing on petitioner to sue under section 741. The statute provides that it covers only persons who actually "perform[ ] health care services" (§ 741 [1] [a]). Health care institutions employ many people who do not perform health care services. While such an employee might, out of concern for patients, disclose perceived improprieties in the quality of patient care, that motivation, however commendable, would not bring within the purview of the statute an accountant, a social worker, or, as here, a person who reviews research documentation for compliance with legal requirements.

Notwithstanding that, as a registered nurse, petitioner was qualified to provide health care services, HHC plainly did not employ her to do so. To reiterate, she did not provide care; she did not supervise those who provided care; and she did not facilitate the provision of care through resource allocation. She reviewed paperwork for compliance with legal requirements, which, under *Reddington*, does not qualify petitioner as a member of the class of those "who perform[ ] health care services" (§ 741 [1] [a]), for whose sole benefit the statute was enacted. Accordingly, *Reddington* mandates dismissal of petitioner's claim under section 741.

Petitioner's remaining claims against HHC are also without merit as a matter of law. The claims for violation of Administrative Code of the City of New York § 12-113 and for violation of her constitutional right of free speech are barred because her assertion of claims under Labor Law §§ 740 and 741 waived her right to assert whistleblower claims under other provisions of law (*see Reddington*, 11 NY3d at 87, 89). Finally, petitioner's cause of action for tortious interference with prospective business relations fails as a matter of law because she does not identify any third party with whom she lost the prospect of doing business as a result of HHC's actions (*see Carvel Corp. v Noonan*, 3 NY3d 182, 189-190 [2004]). Concur—Friedman, J.P., Freedman and Richter, JJ.

Moskowitz, J., dissents in part in a memorandum as follows: For the reasons that the majority states, I agree that we should dismiss petitioner's Labor Law § 740 claim on the basis that it is time-barred. I also agree that we should dismiss petitioner's

claims for tortious interference with prospective business relations, violation of Administrative Code of the City of New York § 12-113 and violation of the constitutional right of free speech. However, in my view, the motion court properly granted petitioner's motion for leave to file a late notice of claim. Similarly, I believe that at this stage of the litigation, petitioner has adequately pleaded a cause of action for violation of Labor Law § 741. Therefore, I respectfully dissent.

Petitioner is a former employee of New York City Health and Hospitals Corporation (HHC) in its Office of Clinical and Health Services Research (OCHSR). In this action, she sues for retaliatory termination, alleging that OCHSR fired her after she reported HHC's noncompliance with regulations designed to protect human subjects in research studies. Likewise, petitioner alleges that OCHSR fired her for trying to remedy HHC's noncompliance.

In January 2008, HHC hired petitioner, a licensed registered nurse with over 20 years of experience in the clinical research field, as a director of OCHSR, with the title of Human Research Protection Program QC/QA/QI Regulatory Specialist. Petitioner reported to Nonie Pegoraro, Senior Director, who herself reported to HHC officials.

According to federal regulations, researchers at HHC facilities had to obtain approval from OCHSR before beginning research studies involving human subjects. In September 2008, petitioner assumed the responsibility of reviewing research proposals to ensure that HHC's affiliated hospitals had complied with these regulations. In the course of her review, petitioner identified a number of HHC hospitals, including Bellevue and Harlem Hospitals, that were missing necessary documents, including informed consent forms and Institutional Review Board (IRB) approvals.

Petitioner reported to Pegoraro her concerns about the missing documents. In addition, she tried to remedy the alleged noncompliance by sending out notices to the hospitals involved. For example, in late 2008, petitioner contacted Ernest Marrero, research chair of Bellevue, to inform him of his facility's noncompliance and to explain the reason OCHSR had not approved the facility's research proposals. From late 2008 to early March 2009, petitioner alleges, Marrero objected to her questioning of Bellevue protocols and resisted her efforts to effect compliance. During this time, petitioner repeatedly discussed her concerns with Pegoraro, who in turn discussed petitioner's concerns with her superiors, HHC officials.

Eventually, OCHSR determined that Harlem Hospital's

noncompliance warranted suspension. In early February 2009, at petitioner's recommendation, OCHSR notified Harlem Hospital of OCHSR's intent to audit a number of studies. Petitioner alleged that HHC officials objected to the proposed suspension and took actions to resist it.

In March 2009, with the goal of overcoming HHC's resistance to the proposed suspension, petitioner and Pegoraro prepared audits documenting outstanding issues in five Harlem Hospital research proposals. According to petitioner, HHC's special counsel confirmed the audits' findings. On March 24, 2009, petitioner and Pegoraro attended a meeting at Harlem Hospital to address the facility's noncompliance. Petitioner believed the purpose of the meeting was to move toward resolution of the noncompliance issues. Instead, meeting attendees discounted petitioner's concerns, characterizing them as "irritating."

After the meeting, petitioner and Pegoraro continued to urge that HHC comply with regulations. For example, OCHSR requested that Harlem Hospital forward documentation relating to informed consent and IRB approvals. In addition, Pegoraro unsuccessfully sought approval from HHC officials to schedule follow-up meetings so that she and petitioner could review the records of outstanding research proposals, including the medical records of research participants.

Petitioner alleges that on April 6, 2009, without any previous warning or notice, HHC's security chief appeared at her desk and escorted her out of the building to HHC's Human Resources office. There, she received a letter stating that HHC was terminating her, effective immediately, because of budgetary constraints. Petitioner knew that layoffs were due to occur by June 30, 2009 but asserts that fiscal problems were merely a pretext for her termination. HHC later named Marrero as Corporate Compliance Officer, with supervisory authority over Pegoraro and OCHSR. In May 2009, HHC terminated Pegoraro summarily and without warning.

On June 29, 2009, within 90 days of her termination, petitioner served a notice of claim on the New York City Comptroller rather than directly on HHC. In the notice, petitioner identified HHC as the "city agency involved" and provided the factual basis for her claim. Specifically, petitioner recounted the events surrounding her termination and asserted that HHC had wrongfully retaliated against her for her reports of regulatory noncompliance at HHC affiliates. The Comptroller's office accepted petitioner's notice of claim, acknowledged receipt of the claim in writing, and assigned petitioner a claim number.

Meanwhile, on June 5, 2009, also within 90 days of petitioner's termination, Pegoraro served her own notice of claim on HHC, specifying her claim of retaliatory termination. On January 5, 2010, she commenced a federal court action for retaliatory termination, alleging that her termination violated New York and federal law. In the course of investigating Pegoraro's claims, HHC's Inspector General met twice with Pegoraro and, in March 2010, once with petitioner.

On July 2, 2010, petitioner filed the summons and verified complaint in this action. She asserted five causes of action: (1) retaliatory termination in violation of Labor Law § 740; (2) retaliatory termination in violation of Labor Law § 741; (3) violation of petitioner's free speech rights under the New York Constitution, article I, § 8; (4) violation of Administrative Code § 12-113 by terminating petitioner for making a report of information she believed to present a risk of harm to the health and safety of a child; and (5) common-law tortious interference with prospective business relations for allegedly interfering with petitioner's later efforts to obtain employment.

On the same day, petitioner filed a verified petition and moved by order to show cause for an order deeming her notice of claim timely served on HHC, nunc pro tunc. In the alternative, she sought leave to file a late notice of claim.

The motion court granted petitioner leave to serve a late notice of claim. Noting that HHC was a City-affiliated organization, the court found that petitioner had shown a reasonable excuse for erroneously filing her notice of claim with the City Comptroller. The court also found that "HHC officials were well aware of" petitioner's noncompliance concerns and her termination, thereby acquiring actual knowledge of the essential facts underlying petitioner's claim (2010 NY Slip Op 32753[U], *6 [Sup Ct, NY County 2010]). Further, the court held, the lateness of petitioner's claim would not prejudice HHC because, among other things, HHC had timely notice of Pegoraro's claim, which was based in part on the same underlying events as petitioner's claim. Therefore, the court concluded, HHC had presumably taken steps to preserve evidence relating to those claims.

Finally, the court rejected HHC's argument that Labor Law § 740 barred petitioner's claims as untimely. Rather, the court held, the one-year and 90-day limitations period set forth in the New York City Health and Hospitals Corporation Act (the HHC Act) (McKinney's Uncons Laws of NY §§ 7381-7406) took precedence over other limitations periods, including the one-year limitations period in Labor Law § 740.

General Municipal Law § 50-e (1) requires that a petitioner in a tort action against a public corporation serve a notice of claim on that entity within 90 days after the claim arises. The statute's intent "is to protect the municipality from unfounded claims" and to ensure that it has an adequate opportunity to explore the claim's merits while information is still readily available (*Matter of Porcaro v City of New York*, 20 AD3d 357, 357 [1st Dept 2005]). However, courts should liberally construe the statute because it is remedial in nature (*Camacho v City of New York*, 187 AD2d 262, 263 [1st Dept 1992]) and should not operate to frustrate the rights of those with legitimate claims (*see Porcaro*, 20 AD3d at 358).

Under General Municipal Law § 50-e (5), a court has discretion to grant leave to serve a late notice of claim after considering, "in particular, whether the public corporation or its attorney or its insurance carrier acquired actual knowledge of the essential facts constituting the claim within [90 days of the claim's accrual] or within a reasonable time thereafter." The court must also consider all other relevant factors, including whether "the claimant in serving a notice of claim made an excusable error concerning the identity of the public corporation against which the claim should be asserted . . . and whether the delay in serving the notice of claim substantially prejudiced the public corporation in maintaining its defense on the merits" (General Municipal Law § 50-e [5]; *see also Williams v Nassau County Med. Ctr.*, 6 NY3d 531, 539 [2006]; *Ifejika-Obukwelu v New York City Dept. of Educ.*, 47 AD3d 447, 447 [1st Dept 2008]). The party seeking leave to serve a late notice of claim bears the burden of establishing these criteria (*see Matter of Kelley v New York City Health & Hosps. Corp.*, 76 AD3d 824, 826 [1st Dept 2010]; *Matter of Lauray v City of New York*, 62 AD3d 467 [1st Dept 2009]).

Here, HHC had timely notice of the essential facts underlying petitioner's claim. The record demonstrates that HHC officials were actively involved in petitioner's termination and were well aware of her concerns about HHC's alleged regulatory noncompliance. Indeed, petitioner alleges that before her termination, HHC's special counsel confirmed the findings in petitioner and Pegoraro's audits, which addressed that very noncompliance.

Further, as noted above, Pegoraro timely commenced a separate action for retaliatory termination, and HHC's Inspector General investigated that action. Because the facts of Pegoraro's action paralleled those in petitioner's action—to be sure, Pegoraro's action was based on the same events—HHC was on notice within the statutory time frame of the facts underlying petitioner's action.

That petitioner served the notice of claim on the City Comptroller, rather than on HHC, constituted a reasonable and excusable error (*see Harris v City of New York*, 297 AD2d 473, 474-475 [1st Dept 2002], *lv denied* 99 NY2d 503 [2002] [distinguishing the case then at bar from a situation in which the claimant's error "rested on an excusable confusion as to the proper governmental entity to be served with the notice of claim"]). Petitioner served her notice of claim within 90 days of her termination and identified HHC as the agency involved. The Comptroller, in fact, actively endorsed her error by formally acknowledging her claim and assigning her a claim number. This kind of error warrants late filing relief (*see Matter of Gherardi v City of New York*, 294 AD2d 101 [1st Dept 2002]; *Tadros v New York City Health & Hosps. Corp.*, 112 AD2d 85, 86 [1st Dept 1985] ["(M)istaken belief that HHC was a city agency (is) a sufficient excuse warranting late filing relief"]).

One point does run in HHC's favor: generally, a petitioner seeking late filing relief must also set forth some "excuse for [a] lengthy delay in seeking leave to serve a late notice of claim" (*Matter of Reed v County of Westchester*, 222 AD2d 679, 679 [2d Dept 1995]; *see Matter of Nairne v New York City Health & Hosps. Corp.*, 303 AD2d 409, 410 [2d Dept 2003]). Here, although petitioner has sufficiently explained her initial mistaken filing, she has failed to offer any explanation for the subsequent long delay in seeking late filing relief (*Matter of Matarrese v New York City Health & Hosps. Corp.*, 215 AD2d 7, 9 [2d Dept 1995], *lv denied* 87 NY2d 810 [1996]). This fact does militate against her argument that the motion court properly permitted her late filing.

On balance, however, petitioner's delay is excusable. In cases where courts have found inexcusable delay in seeking late filing relief, the petitions suffered from two deficiencies: first, they failed to set forth any excuse for the delay; and second, they failed to demonstrate a lack of prejudice to the opposing party arising from the delay (*see Matter of Reed*, 222 AD2d at 679; *Matter of Nairne*, 303 AD2d at 410; *Matter of Matarrese*, 215 AD2d at 9-11). By contrast, as noted above, petitioner has shown that any delay did not prejudice HHC, because that entity was timely aware of the facts surrounding petitioner's claim and, in fact, one of the defendants in the underlying action gave a deposition in August 2010. Likewise, as also noted above, petitioner has shown a reasonable excuse for her delay—namely, that she served the City Comptroller rather than HHC.

In addition, *Reed*, *Nairne* and *Matarrese* present markedly different factual situations from the one presented here. In

*Reed,* the court found the papers supporting the proceeding to be "patently insufficient," as they failed to allege the manner in which the respondents were negligent or committed malpractice (222 AD2d at 679). In this case, on the other hand, there is no allegation that the papers do not adequately set forth petitioner's causes of action. And in *Nairne* and *Matarrese,* there were seven-year and eight-year delays, respectively, in making the applications (*Matter of Nairne,* 303 AD2d at 409-410; *Matter of Matarrese,* 215 AD2d at 9). In this case, the delay was around 15 months.

Thus, considering all the relevant factors, I believe that the motion court correctly granted petitioner's motion for leave to serve a late notice of claim.

With regard to Labor Law § 741, HHC argues, and the majority agrees, that petitioner's proposed cause of action is patently meritless because she is not an "employee" for purposes of that statute. Labor Law § 741 prohibits a health-care employer from taking any retaliatory action against an employee who "discloses or threatens to disclose to a supervisor, or to a public body an activity, policy or practice of the employer or agent that the employee, in good faith, reasonably believes constitutes improper quality of patient care" (Labor Law § 741 [2] [a]).

Unlike Labor Law § 740, which broadly defines an "employee" to include any individual who "performs services" for any employer, section 741 defines an "employee" much more restrictively, as "any person who performs health care services for and under the control and direction of any public or private employer which provides health care services for wages or other remuneration" (Labor Law § 741 [1] [a]). Thus, to determine whether petitioner falls under the aegis of Labor Law § 741, we must decide whether she "performs health care services."

The Court of Appeals has addressed this issue, holding that, while not necessarily excluding persons other than doctors and nurses, section 741's "specialized protections . . . were meant to protect professional judgments regarding the quality of patient care" (*Reddington v Staten Is. Univ. Hosp.,* 11 NY3d 80, 92 [2008]). Hence, the Court held, "an employee of a health care provider must 'perform[ ] health care services,' " meaning that the employee must "actually supply health care services, [and] not merely . . . coordinate with those who do" to receive "the special protections of section 741" (*id.* at 91, quoting Labor Law § 741 [1] [a]). The Court further stated that section 741 "safeguard[s] only those employees who are qualified by virtue of training and/or experience to make knowledgeable judgments as to the quality of patient care, and whose jobs require them to make these judgments" (*id.* at 93).

On that basis, the *Reddington* Court held that Labor Law § 741's definition of "employee" did not encompass the plaintiff because she did not care for patients, nor did she have any responsibility for ensuring proper patient care (*id.* at 83-84 [describing the plaintiff's duties as involving, among other things, coordinating patient travel and providing patients with translation services]). Further, the Court held, section 741 contemplates a "registered professional nurse" "speaking out about [her] perception of inadequate staffing levels," in violation of Department of Health regulations governing nurse staffing (*id.* at 92).

Here, I believe that for pleading purposes, petitioner falls within the definition of an employee under Labor Law § 741 because she has, in fact, alleged that she is a "licensed registered nurse" responsible for "ensur[ing] that all human subject research regulatory requirements were met for new and continuing research conducted at HHC hospitals." Under the standards of the *Reddington* Court, this allegation is more than sufficient to sustain petitioner's claim on a motion to dismiss (*see also Webb-Weber v Community Action for Human Servs., Inc.*, 23 NY3d 448, 453-454 [2014], *revg on other grounds* 98 AD3d 923 [1st Dept 2012]).

In arguing that petitioner is not an "employee" within the meaning of section 741, the majority refers to our decision in *Webb-Weber* (98 AD3d 923). As the majority notes, the Court of Appeals in *Webb-Weber* recently reversed this decision insofar as we dismissed the claim under section 740; however, the Court did not address the viability of the section 741 claim because the plaintiff abandoned that claim on her appeal to the Court of Appeals and asked only for reinstatement of the Labor Law § 740 claim (23 NY3d at 451 n 2).

Nonetheless, *Webb-Weber* still does not foreclose petitioner's action in this case. The *Webb-Weber* plaintiff, who was the chief operating officer of the defendant health care provider, did not allege that she used her training to provide mental health services or other services that might qualify as health care (98 AD3d at 924). Indeed, reference to the complaint in *Webb-Weber* reveals that there was no connection between the plaintiff's professional training and the allegedly harmful conditions that she complained about.[2] Instead, the plaintiff, who was trained as a clinical social worker, complained about matters including lack of podiatric care for patients, lack of safe egress from facil-

---

2. This Court may take judicial notice of undisputed court records and files (*Pramer S.C.A. v Abaplus Intl. Corp.*, 76 AD3d 89, 102 [1st Dept 2010]; *Matter of Khatibi v Weill*, 8 AD3d 485, 485 [2d Dept 2004]).

ity premises, improperly working doors that caused injury to a patient, faulty plumbing, nonworking fire alarms, financial improprieties and sloppy construction work. Her complaints about these matters, the plaintiff alleged, resulted in her unlawful dismissal. But none of these various complaints required any application, even tangentially, of the plaintiff's health care training; her experience in health care was entirely unrelated to the allegations of her complaint. The *Webb-Weber* plaintiff, therefore, fell outside the "specialized protections of Labor Law § 741[,] [which] were meant to protect professional judgments regarding the quality of patient care" (*Reddington*, 11 NY3d at 92).

Similarly, *Reddington*, upon which the majority also places much reliance, does not serve to foreclose petitioner's action. In *Reddington*, the plaintiff had begun her tenure at the defendant hospital by working in volunteer services (*id.* at 82). She later began working as a translator for a group of Italian patients and their families, eventually attaining the title of "Director-International Patient Program" (*id.* at 83).

However, nothing in the *Reddington* decision suggests that the plaintiff was a medical professional, or that she used any medical or paraprofessional training to perform the tasks within her job description. The job description itself, which is set forth in *Reddington*, listed no duties requiring medical training. Instead, the description made clear that at most, one of the plaintiff's duties involved interaction with medical personnel to determine what services the defendant hospital would provide to international patients (*id.* at 83-84). The rest of the plaintiff's listed duties comprised tasks such as coordinating transportation, developing a calendar of activities for international patients, and coordinating marketing efforts for the international patients' program (*id.*). In light of the facts set forth in *Reddington*, it is difficult to discern how the majority can fairly characterize the *Reddington* plaintiff's tasks as "closer to providing health care services" than the ones petitioner undertook at OCHSR.

In this case, petitioner pleaded that she was a licensed and registered nurse with over 20 years of experience in clinical research. What is more, her allegations of wrongdoing related directly to her health care and research experience. Indeed, petitioner alleged that she was ultimately impelled to act because of the potential harm that might be inflicted on patients as a direct result of HHC's regulatory noncompliance. Further, petitioner alleged, she had grown concerned with the possibility that "patients enrolled in ongoing studies would be deprived of the opportunity to continue treatment if the studies lacked the requisite approvals."

These allegations encompass precisely the type of "professional judgment[ ] regarding the quality of patient care" that the Court of Appeals contemplated in *Reddington* (*see id.* at 92). That the patient care in this case depended on compliance with research protocols rather than on implementing specific medical procedures does not serve to render petitioner's claim patently meritless at this stage of the litigation. This conclusion holds especially true in light of the fact that petitioner's professional experience was not only in nursing, but in clinical research.

The majority, in further support of its argument that petitioner was not an "employee" within the meaning of section 741, adopts HHC's position that petitioner "did not see, treat or otherwise interact with patients, nor did she have any decision making authority regarding direct patient health care." This assertion misses the point. Neither section 741 nor the Court of Appeals mandates that an "employee" must directly treat or interact with patients to receive section 741 protection. Rather, as the *Reddington* Court stated, section 741 safeguards "those employees who are qualified by virtue of training and/or experience to make knowledgeable judgments as to the quality of patient care, and whose jobs require them to make these judgments" (*id.* at 92-93). The complaint adequately pleads that petitioner fell under this rubric during her employment with OCHSR.

As a result, affording the complaint a liberal construction and giving petitioner the benefit of every possible favorable inference, as we must at this stage of the litigation, petitioner's proposed claim under section 741 is not so "patently meritless" as to warrant denial of her application for late filing relief. This was the very standard that the Court of Appeals advanced in reversing our decision with respect to section 740 in *Webb-Weber* (23 NY3d at 453-454).